Good morning, Your Honor. May it please the Court, my name is Jeff Price. I'm representing the Plaintiff Appellant in this case. I'd like to point out, first of all, that the evidence that is discussed throughout this case, the video recording, was exculpatory evidence. I would like to next make a correction to the supplemental brief that I filed. On page 3 at the top it says that the videotape was not turned over until approximately two months after the charges were brought. That's actually mistaken. The videotape was not turned over until later than that. It was November 25, 2003, which was about two months after the incident, that the district attorney's office requested that the police turn the videotape over to the DA's office. The police had never turned over the videotape to the district attorney's office. They identified it in the police report, though. I mean, you have to present a package of material to the DA's office. They falsified it in the police report. No, no, no. Did they identify the existence of the videotape? Correct, and falsified what the videotape shows. So not only... So, I looked at the... you provided us a copy of the videotape. Yes. It's not much of a videotape. It shows very clearly that what Mr. Guth stated in his report is false. Clearly. So, what did... Guth actually admits that in the preliminary hearing. What did he say in his report that you say is false? He says that I could not tell when he was on the videotape if he had a gun. That is absolutely false. In the preliminary hearing... What if I told you I looked at that videotape? I couldn't tell if he had a gun. I would disagree because I looked at the videotape and I can clearly tell that he didn't have a gun. You can clearly tell it? Do you know if I'm carrying a weapon now? No, but on the videotape, the person's body is completely exposed and his hand... Naked? His hand is raised. Naked? That's not the... the issue is whether he brandished a gun, Your Honor. That was what was claimed by Ms. Miller. So, your point though is, I guess, because you have to deal with the Smitty presumption. Correct, and I believe... So, you're trying to show that the characterization in the police report was, as you used, the word you used, was just blatantly false. And therefore, that misled the DA. Absolutely. Mr. Guth made his decision to arrest my client on the 28th. That's when he executed the probable cause declaration. That was the date of the incident. He didn't see the videotape at the earliest until September 29th. He had already made up his mind. His report was not typed until September 30th. His report was not provided to the district attorney's office until October 1st. Fontana pressured the district attorney to file charges. That is undisputed. And on October 1st... Fontana, who's Fontana? That's the city, the police department. The city of Fontana, it is admitted by... ...to the DA and said, boy, you better file a charge. Jacobson, and that is in the exceptional record, Jacobson... Is Jacobson the arresting officer? No, he's the detective, who is also a defendant in the case. Okay. So, Jacobson goes to the DA and says, boy, you better file a charge. The DA wrote, which is in the record, that the DA was requested to expedite filing in the case. The DA acknowledges it. Jacobson acknowledged it. That is in the record, in the excerpts of record. That's because he was going to get out. Correct. So, now, what was false about... In answer to Judge Fletcher's question, what was false? Just the way the officer described the tape? The officer, as I stated in the supplemental, the officer says, I could not tell whether or not Suspect Colbert had a weapon in his hand at any time while he was on the videotape. That is a false statement. He admitted that he could not see a gun in his hand in the preliminary hearing, which took place on October 22nd, when questioned on cross-examination. He was asked, and he finally admitted it, on... ...excerpt from record 416, when you are viewing the tape, you can't see the gun. No. You know, this may be parsing it too fine, but we've got a videotape that... It's not a constant videotape, but it's at particular points, right? It's a constant videotape. It depends how it's viewed, what type of equipment one is viewing it with. He... It shows him the whole time that he's around the gas station? Yes, it shows... First of all, after he got out of the store is completely irrelevant, because the statements of Ms. Miller were clearly that before he went to the store, he brandished the gun. She says that he exited his car, he started walking towards the store, and then brandished the gun. That's what she says. So anything that occurred after he went into the store is irrelevant, even though he is shown at that point as well. Now, the videotape was never given to the district attorney until, I believe, 04. Now, let me just ask you this. So these DAs, you know, they make the filing decisions theoretically. I mean, our case law says that their decision and, you know, if the DA wanted to look at the videotape, why couldn't he just call the cop? You know, send me the videotape. I want to see what it shows. He was pressured to make a filing which he made virtually instantaneously. So you don't think the DAs have enough, how would you say, gumption or whatever just to say, send me the tape, I want to see it? Your Honor, I don't want to make a statement across the board about DAs. In this particular circumstance, the evidence shows that Mr. Balderrama was pressured. So the DA is just a lackey of the police department? No, he is a line DA who is filing a lot of complaints. He's very busy. He sees a circumstance here with someone who may have been arrested before on weapons charges and he's asked to make a quick decision. He's pressured. Let me ask you a legal question. Do you think that our recent decision in Beck versus I guess the city of, I forget what city it is. The city of Upland. Upland. Do you think that has any relevance to the issues here? Yes. How? How so? At least in the sense that Beck versus the city of Upland clearly frowns upon the argument that the prosecutor just has completely unfettered discretion just to make a decision and not even review any evidence. So that is frowned upon in the Beck decision. In other words, the prosecutor simply reviewing the police officer's report and simply making a decision just based on that is questioned again in Beck. That was already questioned before in other cases such as Awabdi. Okay. I don't think Hartman itself really is terribly. So you say after Hartman and after Beck, your view as a practitioner in the field is that Smitty is still the proper analysis. I think Smitty needs to be cleaned up, but it's okay. In this case, it doesn't really matter. This is not the case where it matters in my view. Well, you know, under Hartman, the critical question is lack of probable cause. I would like to reserve a few seconds for rebuttal and also just to say on this. Go ahead and answer the question, and we'll make sure you have the rebuttal. All right. Under Hartman, it's lack of probable cause. Right. The probable cause issue has been a bit obscured by the Beck v. City of Upland case. Well, do you think they had probable cause for both counts? No. I think the problem in this case is that the whole probable cause analysis undertaken by the district attorney's office and by the court was tainted. But under Singleton v. Perry, which is an old California case addressing malicious prosecution, different charges are severable in a malicious prosecution case. A malicious prosecution defendant cannot be exonerated simply because that defendant has the fortune to wage a malicious prosecution against someone who is also the subject of a prosecution on another charge that may be valid. And that is clearly stated in California law, which, according to Obabdi, is incorporated into this jurisdiction's law of malicious prosecution. Okay. Okay. Let's hear from the police department, and then we'll give you a chance to respond. May it please the Court. Good morning, Your Honors. Celeste Brustewitz on behalf of the appellees. Sometimes it's hard to know where we are on this summary judgment case, but I just want to take a couple moments to review the facts. None of these people knew each other before any of this incident happened. There was a road rage incident on the 215 involving a middle-aged lady with three 9-year-old kids in her Ford Focus and Mr. Colbert, who was with his wife and son in a larger pickup truck of some sort. Mrs. Miller called the police while the event was occurring. Mr. Colbert never called the police until much later when he knew the police were looking at him. When the police went out to see Mrs. Gilbert, she was consistent with somebody who had been in a road rage incident and who had witnessed a crime and was fearful. She was hysterical, and the children that were with her were hysterical. She told Officer Guth, I got into this road rage incident. He scared me. He was braking in front of me. He followed me. He was at the Chevron station, and he brandished a gun. It was nothing about Mrs. Miller that made you not believe her. In fact, everything about her made you believe what she was saying. Officer Guth went to go look at the film. In the film, you'll see Mr. Colbert. We've all seen it. He's wearing a very blousy shirt, which the district court judge found very important, because Mrs. Miller said that the gun was in his waistband. And the court said, I can't see what's in his waistband because his shirt is so blousy. No, Your Honor, nobody was naked in this case. This guy was wearing big, baggy clothes. The most important thing is that Mrs. Miller says as he's walking to the Chevron station, he brandishes a gun. What's good about the videotape and good about the photographs that we isolated for you is that just as I walk away from this podium, Mr. Colbert walks completely out of view, and then he goes into the Chevron store, and then he comes back into view after that. And that's the part where maybe he could have brandished a gun. Because he steps out of sight on the video. Yes, out of sight before he goes into the Chevron store. I mean, the pictures are there. I don't need to tell you ten times. I don't need to write it ten times. It's there. It's a picture. He's out. He's out of the picture. And you have plenty of time to brandish a gun and then get back in the picture. We have then a district attorney who, unlike the district attorney in Beck, cooperates fully with us. He sits down for a deposition. He makes his whole file available. And this is the district attorney who just decided to charge Mr. Colbert. This is not the district attorney who handled the case through the preliminary hearings. And there were two. And he's not the one who ultimately decided to dismiss the charge in the interest of justice, the charge on the freeway charge, as we've termed it. This is a guy who said, I don't look at videotapes. I don't have time to look at videotapes. He said, I know there was a videotape and I read Officer Goose's report. I rely on the police. And what I understood from Officer Goose's report was that he couldn't verify Mrs. Miller's statement. It was inconclusive. That's it. That's all it is. And that's it. We don't look at it subjectively. We look at it objectively. Correct. Look at it objectively for the purposes of this. So Smitty says there's a presumption that he exercises independent judgment. Correct. Okay. And that he filed just on his own assessment. Correct. Okay. So then Smitty says the plaintiff has to come back and rebut that presumption. It does. Right? It does. It really doesn't make any difference in that sense what the DA was thinking in his brain. Well, I think what's important is then what does the plaintiff point to to show? Well, what the plaintiff wants to show. And here they could point to, as Smitty talks about, that the police or somebody in the police department made improper, you know, efforts to convince the DA to file or supplied incorrect information or lied or, you know, withheld information. So you look at that and then you ask is that sufficient to rebut the presumption. If you had evidence. And here what he does is he says he lied. He didn't lie. He lied because what he did was he misrepresented what's on that videotape and that, you know. And further, the police department said, hey, he's going to get out in four days if you guys don't file. What the police department. Is that enough to rebut the Smitty presumption? No, it isn't. But I also want to tell you what we also proved at the summary judgment hearing, which isn't in the district court decision, because we went through all three elements of the malicious prosecution cause of action, which requires malice on the part of Officer Guth. They're only, they were trying, plaintiff argued that there should be an inference of malice on the part of Officer Guth because some of the children in the car were children of law enforcement. Officer Guth testified affirmatively that that was not the case. He didn't really understand the relationship, but he did have a general notion that one of the kids or more of the kids were related to law enforcement. We also showed that on both charges there was no favorable termination in favor of Mr. Colbert. We showed that on the weapon charge, Officer Guth testified, and this is, I guess, why the Smitty presumption is important, or really is important, is because Officer Guth doesn't have any control over what the DA does at the preliminary hearing, and he didn't call Mrs. Miller. And the judge said, I want to know what Mrs. Miller knows about guns because that's what this statute requires for me. And Guth doesn't know what Miller knows about guns. I'll let you refile the charges. The DA didn't refile the charges. Then what happened on the freeway charge is the judge said, yeah, you've met the burden on that one. The defendant will have to answer for that charge. That charge was ultimately dismissed by the DA in his own discretion. The California Supreme Court, we've cited all the cases, said, look, a 1385 section dismissal doesn't mean that it's a favorable termination in favor of the defendant. All it means is it got dismissed. If you want to rely on some judgment, I mean, it's a malicious prosecution. There has to be a prosecution that was wrong. There's no evidence in this record that the charges against this guy were wrong. They didn't go forward, but there's no evidence that he was innocent of them. And that's what he has to have under California law. And under 1983, adopting a malicious prosecution, you are assuming the elements of California state law. The other thing, the third element, actually, it's the second one, I'm going to get them out of order, is probable cause. Two judges found probable cause on the arrest warrant. They found the warrant for the probable cause for the freeway charge. And the district attorney, Mr. Balderrama, said he found probable cause when he filed charges on all of them. Well, they're finding probable cause isn't binding on us. It's not race judicata or anything. I understand that. Or, you know, it's not. Oh, it's not. No. But the whole point of Snitty and the presumption that you all established, and then you kind of contoured it later with Newman to say what is the quality of evidence that we can have to rebut this, is that we're going to assume that the DA, when he acts, acts independently. That's going to break a torque chain causation issue between the police officer's conduct and the DA. And what you have to have is some evidence that the police officer affirmatively and wrongfully affected the decision of the district attorney. And you simply don't have it in this case. The DA said, I knew there was a videotape. I never look at them. I knew that Goose thought that the tape was inconclusive. And that's what Goose says. You can pluck one little line or one little phrase out of Officer Goose's report. It's like a ten-page report. It's not fair to him. The ultimate conclusion of what Goose said was the tape is not conclusive. It doesn't support necessarily what Mrs. Miller said. And isn't the fact that Officer Goose went to go get the videotape kind of proof that he wasn't full of malice towards Mr. Colbert? He was actually trying to verify the information that Mrs. Miller had given? So what do you make of our discussion in Beck and a partner? What I think about Beck is, is I wish we had a better case so you could broaden Smitty. Because I think what you're trying to say, well, this case is Newman as far as I'm concerned. It's Newman versus Orange County. It's just his word and nothing else, his conjecture and all that. But what you were trying to say in Beck is, or I think you said in Beck, is that under certain circumstances, maybe there ought to not be a Smitty presumption at all. Because it's not fair. Because somebody may not have access to the information of the district attorney. I think it was in Beck where the district attorney took a privilege, even though he has absolute immunity. That's kind of weird. Now, the district judge, I guess, didn't get to the question of qualified immunity for the police officer. He did not, because he found that we met our burden and the burden was not there. That's why I wanted to be sure to tell you that we didn't just go in on Smitty. We went in on all three elements. We showed that he did not have the evidence to meet his burden at trial, and it's all there. Thank you. Thank you very much. Response? We'll give you a minute. That last comment is absolutely untrue. The only ground raised in their summary judgment motion was the independent judgment ground. That's it. Now, another thing the district court didn't do correctly is it didn't use the burden of proof of Smitty properly. It's a burden of production. Plaintiff comes forward with evidence, the burden shifts back to defense. The judge didn't do that. But even if he didn't do that, which he didn't, it's fine, because we still met the burden. Now, one thing I need to say about favorable termination, it is ludicrous to say that in this case there was not a favorable termination. This case was terminated upon motion of the DA for insufficiency of the evidence. Now, what part of the case are you talking about, the gun part or the road rapier? The entire part. At the end of the case, the case was terminated. They didn't have to answer to the gun charge. Correct. That was terminated for insufficiency of the evidence. The judge terminated that one for him. The court determined that, and the district attorney in that case, there was a third district attorney. She was the one who was handling the prelim. She made a big issue about that and acted like she wanted to, you know, she said she was going to refile it, actually. She told the judge she was going to refile it. She didn't have the videotape. That person did not have the videotape at that time, and that case was never filed. That part of the case was completely terminated favorably, and the entire case was ultimately favorably terminated. And the DA moved to dismiss the road rage, the incident on the freeway.  For insufficiency of the evidence. A couple weeks after she saw the videotape, the case was dismissed for insufficiency of the evidence. Is that reflected in the municipal court or superior court record, or is it just? I'm looking at it right now. Just telling us that that's what she did. It's ER 386. ER 386, dismissed pursuant to insufficient evidence to prosecute, Reason 1385 PC. 1385 is not a talisman for no favorable termination. If one reads a Wabdi, the decision by Judge Reinhart, 1385 termination can be favorable as well. But in this case, this is absolutely favorable termination. And the last thing I would like to say is that regarding Ms. Miller's knowledge of guns, Detective, Officer Guth stated in the prelim that he showed Ms. Miller his duty weapon, which was a Glock. And that she said that it looked like that. Okay, the case should be reversed. Thank you. Thank both of you. Holden v. Fontana Police Department, submitted for decision. That concludes our calendar for the week. Thank you.
judges: Fletcher, Paez, Duffy